IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>RAYMOND CURRY,<br><br>                Defendant. | 8:20CR171<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on Defendant Raymond Curry's motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. Defendant made the motion at the close of the government's evidence at trial and again at the close of all evidence. After the jury returned a guilty verdict, the Court expressly took the motion under advisement. Filing No. 78. For the reasons stated, the motion will be denied.

## BACKGROUND

The following facts are summarized from the Transcript (Tr.) of the trial (Filing Nos. 67, 84-87) and, for purposes of this motion, are viewed in a light most favorable to the jury's verdict. For purposes of this Motion, the Court focuses on the initial traffic stop and testimony of DNA evidence.

**I. Initial Traffic Stop**

On February 5, 2020, at around 1:30 a.m., Omaha Police Officers Anthony Barnes and Tammy Phillips were on routine patrol on an otherwise empty Florence Boulevard in Omaha. The officers observed an oncoming vehicle with a burned-out headlight and turned around to conduct a traffic stop. As officers positioned their cruiser behind the vehicle, the vehicle immediately turned right onto Maple Street and parked, partially

1

blocking the lane of travel. After parking the vehicle, the driver—later identified as Defendant—exited and walked away from the still-running vehicle. Officers issued several commands to stop before Defendant stopped walking. After stopping, Defendant told officers that he lived around the corner and that his girlfriend in the vehicle, Otoluse Pahulu, was pregnant and needed medical attention. Pahulu later told officers that she was not pregnant.

As Officer Barnes approached Defendant, Pahulu began to exit the vehicle. Officer Phillips testified that she saw Pahulu holding her left arm close to her body with her other arm relaxed. Officer Phillips testified that Pahulu could have been attempting to conceal something. The video of the stop introduced at trial shows that after Pahulu exited the vehicle, Pahulu attempted to run from Officer Phillips as she attempted to place Pahulu in handcuffs. After a short pursuit, Officer Phillips apprehended Pahulu on the ground. Officer Phillips testified that as Pahulu ran, she discarded an item onto the ground near where Officer Phillips caught her. The item was later determined to be a Jennings 9-millimeter handgun (the "firearm").

While Pahulu was on the ground, she told Officer Phillips, "It's not mine. It's not mine." Tr. 132, Filing No. 85 at 102. Shortly after making that statement, Pahulu told Officer Phillips, "It's mine." *Id.* Officer Phillips got Pahulu to her feet and as Officer Phillips was leading Pahulu away, Defendant yelled to Pahulu, "I told you not to [walk]." Tr. 124, Filing No. 85 at 94. Pahulu responded: "It doesn't matter, it's mine. The gun is mine." *Id.*

Pahulu was arrested and incarcerated in the Douglas County Jail on misdemeanor firearm and obstructing charges. Defendant was not jailed at the time. On two occasions, while still in jail, Pahulu had phone conversations with Defendant. During a call on

February 12, 2020, Pahulu asked Defendant to get her out on bond. During the call, Pahulu told Defendant, "you want me to be the one to admit to everything." *See* Trial Ex. 19. During a call the next day, Pahulu told Defendant to stop "talking to me like it's my fault, like please, because you know half of this shit I'm even going through right now is not even, ain't even my fault." *See* Trial Ex. 20. Defendant responded, "You right…I said you right." *Id.*

## II. DNA Evidence

The government collected DNA swabs from the firearm. At trial, Crime Lab technician Russel Razsler testified that he specifically tested swabs from the textured features of the firearm, including the grip, magazine, release, and slide. Razsler explained that textured areas with high hand activity were most likely to cause skin to be sloughed. The government also presented testimony from a DNA expert, Mellissa Helligso, a forensic DNA analyst at the University of Nebraska Medical Center. Helligso also testified that the textured features of the firearm were more likely to accumulate DNA from skin cells as a result of touch or handling.

Helligso explained that DNA in humans is about 99.9 percent identical, and her laboratory studies the remaining 0.1 percent to generate the unique identity of an individual from a DNA sample. Within the chromosomes found in a DNA sample, analysts test 24 different "locations" to determine whether a specific person's "alleles" appear in any of the locations. An individual's alleles are unique to that person. Helligso used a geographic analogy to explain: if a chromosome is a state, the loci or locations are streets, and the alleles are the individual's specific address. *See* Filing No. 67 at 17-18.

In general terms, to determine whether an individual's DNA is present on an object, analyst compare test swabs taken from the object with swabs taken from an individual. Analysts first determine whether the alleles from the swabs match, and then test the probability of the individual sharing the alleles with the general population. These comparison tests generate one of three conclusions: First, the test could show that the individual was "excluded," meaning the individual was not detected as part of the DNA swabbed from the object. Second, the test could show that the individual was "not excluded," meaning the individual was a contributor to the DNA sample swabbed from the object. Third, the test could show that that the DNA sample was inconclusive, meaning there was not enough data to determine whether an individual was part of a DNA profile or not.

To reach one of these three conclusions for samples taken from the firearm, Helligso used a software called STRMix. STRMix analyzes data from a DNA sample and allows forensic analysts to first determine whether a sample has more than one DNA contributor and, if so, helps tease apart the individual DNA contributors of a sample. Helligso also used STRMix to generate a "likelihood ratio" for the swabs, which is a statistic that measures the likelihood that a particular individual's DNA was a contributor to a sample.

The likelihood ratio is essentially a division problem that measures the likelihood that an individual suspected of being a contributor to a DNA sample divided by the likelihood that unknown, unrelated individuals—essentially representing the people of the rest of the world—contributed to the sample. In its simplest form, the calculation might appear as follows:

$$\text{Likelihood Ratio} = \frac{\text{DNA sample of suspect + DNA sample of 1 unknown individual}}{\text{DNA sample of 2 unknown, unrelated individuals}}$$

If this (simplified) division equation results in a 1, that means that the likelihood on the top of the equation and the likelihood on the bottom of the equation are equally as likely, so the analysis would not be informative. As the number from the equation increases, so does the likelihood that the suspected individual contributed to the DNA sample. Helligso testified that a number between 2 and 99 provides limited support, a number between 100 and 9,999 provides moderate support, a number between 10,000 and 999,999 provides strong support, and a number over 1,000,000 is considered very strong support.

Helligso testified that swabs taken from the firearm showed a DNA mixture of at least three individuals. One individual contributed 84 percent of the DNA on the firearm, another contributed 9 percent, and another contributed 6 percent. Defendant's DNA compared to samples taken from the firearm. These percentages loosely represent the quantity of DNA of each individual retrieved from the swab of the firearm. The higher the percentage of DNA, the more DNA found from a particular swab. Helligso testified that if an individual handled an object more recently, the percentage of that person's DNA found from a swab would likely be higher.

Helligso concluded that Defendant was not excluded as a contributor to the DNA profile swabbed from the firearm. When Helligso analyzed the DNA profile that represented 9 percent of the mixture taken from the swabs, she concluded that the mixture was at least 2.67 trillion times more likely that it originated from Raymond Curry and two unknown unrelated individuals than if it related to three unknown unrelated

individuals. According to Helligso, this likelihood ration showed very strong support that Defendant was a contributor to the DNA mixture found on the firearm.

## STANDARD OF REVIEW

Under Fed. R. Crim. P. 29(a), the district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." "A district court must consider a motion for judgment of acquittal with very limited latitude and must neither assess the witnesses' credibility nor weigh the evidence." *United States v. Johnson*, 474 F.3d 1044, 1048 (8th Cir. 2007). A guilty verdict should be overturned only if, viewing the evidence most favorably to the prosecution, "'no reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" *United States v. Sanchez*, 789 F.3d 827, 834 (8th Cir. 2015) (quoting *United States v. Slagg*, 651 F.3d 832, 839 (8th Cir.2011)). "Like the district court, [the Court of Appeals] view[s] the evidence in the light most favorable to the guilty verdict, and grant[s] all reasonable inferences that are supported by that evidence." *United States v. Dean*, 810 F.3d 521, 527 (8th Cir. 2015).

## DISCUSSION

Defendant was found guilty of being a felon in possession of a firearm. Because Defendant did not have actual possession of the firearm found with Pahulu, the government's theory of guilt was based on constructive possession. The government specifically argues that Defendant had shared dominion and access to the premises where the firearm was located. *See* Gov. Br., Filing No. 82 at 5 (citing *United States v. Vanover*, 630 F.3d 1108, 1118 (8th Cir. 2011)). "Constructive possession may support a conviction under 18 U.S.C. § 922(g) and 'is established if the person has dominion over the premises where the firearm is located, or control, ownership, or dominion over the

6

firearm itself.'" *United States v. Cross*, 888 F.3d 985, 990–91 (8th Cir. 2018) (quoting *United States v. Maxwell*, 363 F.3d 815, 818 (8th Cir. 2004)). In cases of joint occupancy, "dominion over the premises by itself is insufficient to establish constructive possession." *United States v. Howard*, 977 F.3d 671, 675 (8th Cir. 2020) (quoting *United States v. Patton*, 899 F.3d 560, 563 (8th Cir. 2018)) "In joint occupancy cases, there must be some additional nexus linking the defendant to the contraband." *Id.* (quoting *United States v. Wright*, 739 F.3d 1160, 1168 (8th Cir. 2014)). Stated another way, mere proximity to a firearm is not enough to show constructive possession. *United States v. Griffith*, 786 F.3d 1098, 1103 (8th Cir. 2015). "Constructive possession can be proved by circumstantial evidence alone, but only if the government shows a 'sufficient nexus between the defendant and the firearm.'" *Id.* (quoting *United States v. Chatmon*, 742 F.3d 350, 352 (8th Cir. 2014)(emphasis added)).

## I. Support for Verdict Through Non-DNA Evidence

The government argues that it proved a sufficient nexus independently, through non-DNA evidence. Specifically, the government argues that Defendant's suspicious behavior at the scene of the traffic stop and his statements to Pahulu on recorded jail calls form an independent nexus between Defendant and the firearm found with Pahulu. Defendant's behavior was suspicious: after the stop he immediately walked away from the vehicle and made several inconsistent statements to law enforcement. While a reasonable juror could view all these actions as suspicious, Defendant's behavior shows no direct connection between Defendant's behavior and the firearm. Pahulu's statement to Defendant at the scene that "the gun was mine" is suspect but provides no nexus with Defendant's knowing possession of the firearm.

7

The government also argues that conversations between Pahulu and Defendant show that Defendant knew Pahulu had the firearm. However, neither Pahulu nor Defendant made a direct reference to the firearm. During a call on February 12, 2020, Pahulu told Defendant, "you want me to be the one to admit to everything." *See* Trial Ex. 19. During a call the next day, Pahulu told Defendant to stop "talking to me like it's my fault, like please, because you know half of this shit I'm even going through right now is not even, ain't even my fault." *See* Trial Ex. 20. Defendant responded, "You right…I said you right." *Id*. The government argues that a reasonable juror could assume that these statements suggest Pahulu took the firearm to cover for Defendant. However, as with Defendant's behavior at the scene of the traffic stop, these statements show only a tenuous nexus between Defendant and the firearm.

Proof of the required nexus is particularly important in this case because the firearm was not found in a shared location, it was found in Pahulu's sole possession. While the parties have not identified any case that defines the scope of the required nexus, the cases cited in the government's brief suggest that there must be some direct tie between a defendant and the location where the gun what found. For example, in *United States v. Chatmon*, 742 F.3d 350, 352 (8th Cir. 2014), the court concluded there was a sufficient nexus between a defendant and a firearm found in a car because the defendant was driving the car, had personal items in the car, made false exculpatory statement, and was seen moving around in the car before officers approached. In *United States v. Eldridge*, 984 F.2d 943, 946 (8th Cir. 1993), the court concluded there was a sufficient nexus between a defendant and firearms found in the trunk of a car because the defendant had control of the keys to the trunk. In each of these cases, the government

proved at least some circumstantial connection between the defendant and the location where the firearm was located. In this case, the non-DNA evidence shows no such connection. The firearm was found not in Defendant's vehicle, but on another person. Thus, unlike the government's cited cases, the non-DNA evidence shows little connection between Defendant and the area where the firearm was found.

The government attempts to overcome the dearth of non-DNA evidence by citing to cases where circumstantial evidence established possession even where a joint possessor accepted responsibility for a firearm. However, in none of the cited cases was the weapon found in the sole possession of another person. For example, in *United States v. Boykin*, 986 F.2d 270, 274 (8th Cir. 1993), the court concluded there was a sufficient nexus between a defendant and a firearm found between a box spring and a mattress in a bedroom that defendant occupied with his wife. The defendant's wife claimed ownership of the firearm, but the court reasoned that ownership was irrelevant to the issue of possession and defendant had control over the area where the firearm was found. *Id.*; *see also* *United States v. Vanover*, 630 F.3d 1108, 1117 (8th Cir. 2011) (defendant possessed firearm found underneath shared mattress because he had dominion and control over the area where the firearm was found). Both of these cases are distinguishable from this case. In both cases, the firearm was found in a location where the defendant had dominion or control. In this case, the firearm was located in Pahulu's sole possession.

Although, as a general matter, the government can prove joint possession through circumstantial evidence, the government did not show any non-DNA link between Defendant and the firearm. The relationship between the defendant and Pahulu was not

fully developed. The evidence suggested they were to some degree in a romantic relationship. Nevertheless, joint or constructive possession is not proved simply because one's nearby girlfriend has actual possession. The Court is not convinced that Defendant's suspicious behavior and vague statements are sufficient to prove the nexus required to establish joint possession in this case. Accordingly, the Court turns to whether this evidence, combined with the DNA evidence, was sufficient to support the jury's verdict.

## II. DNA Evidence

When combined with Defendant's other behavior, the DNA evidence is sufficient to support the jury's verdict. As noted above, the Court "has very limited latitude in ruling upon a motion for judgment of acquittal." *United States v. Baker*, 367 F.3d 790, 797 (8th Cir. 2004). The Court may only grant Defendant's motion for judgment of acquittal if "there is no interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *United States v. Boesen*, 491 F.3d 852, 855 (8th Cir. 2007) (citations and internal quotation marks omitted). This standard is "very strict" and the Court should not overturn a jury verdict lightly. *Id.* And the Court may not weigh evidence or assess witness credibility. *Baker*, 367 F.3d at 797; *see also Boesen*, 491 F.3d at 857 ("In ruling on a motion for a judgment of acquittal, the role of the court is not to weigh the evidence but rather to determine whether the Government has presented evidence on each element to support a jury verdict.") (citations and internal quotation marks omitted). While the government need not "rule out every reasonable hypothesis of innocence," the evidence must "be sufficient to convince the fact-finder beyond a

reasonable doubt of the defendant's guilt." *United States v. Wright*, 739 F.3d 1160, 1167 (8th Cir. 2014) (internal citation, quotation marks and brackets omitted).

The DNA evidence showed the only direct connection between Defendant and the firearm. At trial, there was no apparent dispute that Defendant's DNA appeared on the firearm. Helligso testified that it was 2.67 trillion times more likely that DNA collected from the firearm came from Defendant than from three unknown, unrelated individuals. Filing No. 67 at 38. Defendant's DNA accounted 9 percent of the DNA mixture found on the firearm. Although contributing a relatively low percentage of DNA to the mixture collected, the government's theory was that Defendant's DNA was present on the firearm because he had control of the firearm at some point.

Defendant argues in his motion that no reasonable juror could eliminate secondary transfer as a reasonable possibility. Secondary transfer of DNA occurs when a person's DNA appears on an object because the person had contact with someone or something that then had contact with the object. Defendant argues that although Helligso testified that secondary DNA transfer is possible, she did not testify how secondary transfer would apply to the facts of this case.

While Helligso's testimony regarding secondary transfer was minimal, it was sufficient to support the jury's verdict. She testified that although Defendant's DNA profile was not fully represented, Defendant had an allele in every sample taken from the firearm, which represented a "significant amount of data" regarding Defendant. Filing No. 67 at 36, 37. Helligso further testified that it was common to detect a partial DNA profile, and the likelihood ratio accounted for a partial profile. *Id.* When asked directly about secondary transfer, Helligso testified that "when an individual directly touches an item, I'm

more likely to generate their DNA profile than if something such as a transfer from another person or an object occurred." Filing No. 67 at 37. Defendant's counsel did not challenge this assertion on cross or through any other evidence. A reasonable juror could conclude from this testimony that because Defendant had an allele at every location, he likely touched the firearm directly. Given the "very strict" standard for a motion for judgment of acquittal the Court cannot overturn the jury's verdict.

Accordingly, IT IS ORDERED Defendant's Motion for Judgment of Acquittal is denied.

Dated this 22nd day of June, 2021.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge